# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 18-08 (RDM) |
| STEVEN GORHAM, | |
| *Defendant.* | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendant Steven Gorham's motion to suppress physical evidence and statements. Dkt. 5. The relevant events occurred on December 4, 2017, when two Metropolitan Police Department ("MPD") officers approached Gorham at the Woodland Terrace apartment complex. At first Gorham ignored them, looking instead at his cell phone, but, as soon as one of the officers addressed him, Gorham fled. After a brief chase, an officer tackled him. Seconds later, another officer frisked Gorham while he was still pinned on the ground, and that frisk revealed a handgun. Based on that evidence and evidence that Gorham had a prior felony conviction, Gorham is charged with one count of violating 18 U.S.C. § 922(g)(1). He moves to suppress the gun and statements that he made after the police caught him, arguing that the officers lacked reasonable suspicion to seize and to frisk him. For the reasons explained below, the Court will **DENY** the motion to suppress.

## I. BACKGROUND

The Court has reviewed Defendant's motion, Dkt. 5, the government's opposition, Dkt. 6, the government's supplemental brief, Dkt. 14, and Gorham's response to the government's supplemental brief, Dkt. 20. The Court held an evidentiary hearing on April 16, 2018, *see* Minute Entry (Apr. 16, 2018), and heard oral argument on May 18, 2018, *see* Minute Entry (May

18, 2018). A further evidentiary hearing was held on June 7, 2018, to hear from the officer who frisked Gorham, *see* Minute Order (May 21, 2018); Minute Entry (June 7, 2018), and the Court heard further oral argument on June 29, 2018, *see* Minute Entry (June 29, 2018). Cornel Kelemen, one of the MPD officers present at Gorham's arrest, testified at the initial evidentiary hearing and footage from his body-worn camera was admitted into evidence as Government's Exhibit 1. Footage from the body-worn camera of Officer Artavius Williams was introduced into evidence as Government's Exhibit 2. Minute Order (June 8, 2018). Officer Michael Moshier, who frisked Gorham, testified at the June 7, 2018 hearing. Minute Entry (June 7, 2018). Footage from his body-worn camera was introduced into evidence as Government's Exhibit 6. Where not otherwise noted, the facts described below are derived from the Court's review of the body-worn camera videos.

On December 4, 2017, Kelemen and three other MPD officers were on patrol near the 2300 block of Ainger Place, S.E., in the District of Columbia. Dkt. 22 at 19. All were members of the MPD's Seventh District Crime Suppression Team, Dkt. 5 at 2, a specialized unit that does not answer radio calls but, instead, goes "to areas that have higher call volume, that have citizen complaints for drug activity, things like that." Dkt. 22 at 5. Members of the team receive additional training, including in identifying armed individuals. *Id.* at 6. On the afternoon of December 4, the four officers drove in a marked police car to Woodland Terrace, a group of apartment buildings located at 2317 Ainger Place, S.E. Dkt. 5 at 2. Each officer was wearing his MPD uniform. Dkt. 22 at 19. The team was responding to "a high number of sounds of gunshots specifically coming from the Woodland [Terrace] area." *Id.* at 12; *id.* at 13 (describing

a "[n]umerous, numerous number of gunshots"). The gunshots had been identified by an automated system employed by the MPD called "ShotSpotter."[1] *Id.* at 12.

Kelemen was sitting in the rear driver's side seat of the car as it approached a courtyard between several apartment buildings. His body-worn camera was on, but nothing meaningful is visible outside the vehicle. A second officer with a body-worn camera, Artavius Williams, was seated in the rear of the car on the passenger's side. Williams's video also shows little of what is occurring outside of the vehicle. Taken together with Kelemen's testimony, however, the Court finds that, as the police car drove slowly down an alley toward the courtyard, the officers "observed a group of individuals"—more than five, less than ten—standing together in the area between the buildings. *Id.* at 20. As the police car approached the group, "two individuals, one of [whom] was the defendant, . . . br[oke] away from that group and walk[ed] to the left side" of the area as viewed from the officers' perspective. *Id.* Kelemen and the other officers had never seen or encountered Gorham before, but their attention was drawn to him because, as the officers were "coming up, [Kelemen] didn't see [Gorham's] right hand swinging as hard as his left hand." *Id.* at 21. Gorham also "picked up a cellphone . . . with his left hand" as the officers approached. *Id.* Kelemen found "those two characteristics . . . a little suspicious" and "traits of an armed gunman or somebody trying to hide something, distract the police officer with a cell phone." *Id.* at 21–22. The government elsewhere describes Gorham's movements as "blading his body away from the officers" and "walking without swinging his right arm." Dkt. 6 at 2.

At that point, Kelemen and two of the other officers exited their vehicle. Gorham and a man in a red sweatshirt continued walking away from the group of people toward a concrete path

---

[1] "ShotSpotter is a system used to automatically detect gunfire and automatically report it to the police." *United States v. Hidalgo*, No. 13-cr-10017, 2015 WL 13388426, at *5 n.5 (D. Mass. Jan. 23, 2015).

running between several apartment buildings. Gorham had a cellphone in his left hand, which appeared to occupy his attention as the officers approached. He walked slowly away from them. Although it is not clear from the video whether Gorham kept his right arm from swinging as he walked, it does show that his right side was turned away from the officers. Around this time Kelemen and Williams activated their body-worn cameras, triggering the recording of sound and preserving the two minutes of footage that led up to the initial in-person encounter. As the officers drew close to the two men, Gorham's view shifted back and forth between his phone and the police. Kelemen called out, "How're you doing gentlemen? Happy holidays." At that point, Kelemen was only a few feet from Gorham, who stopped and raised his cell phone in his left hand, turning toward Kelemen. Gorham looked up from the phone momentarily, before turning to his right and sprinting away down the concrete walkway. None of the other individuals in the courtyard fled.

Kelemen and Williams immediately gave chase. They said nothing to Gorham as they followed him at a full run down the pathway and around two apartment buildings. After about thirty seconds, Williams caught Gorham by his hair and pulled him to the ground. Once Gorham was on the ground, Williams handcuffed him with the assistance of Kelemen and the two other members of the patrol, all of whom arrived within a few seconds of Williams pulling Gorham to the ground. Moshier patted Gorham down after he had been handcuffed, and felt a weapon on Gorham's right thigh, inside of his pants. Dkt. 22 at 28–29. The officers loosened Gorham's belt and pulled down that side of his pants, revealing a handgun just below his waist on his right side. As Gorham was being handcuffed, he also said "I've got weed on me," but no drugs were seized. *Id.* at 29. The police then ran the gun's serial number and Gorham's name through electronic databases, which showed that the gun had been reported stolen and that Gorham had a

previous felony conviction.  Dkt. 6 at 2.  The officers arrested Gorham, who was charged in the

D.C. Superior Court on January 10, 2018.  On January 22, 2018, Gorham was arraigned in this

Court, and, at that time, the D.C. charges were dropped.

## II.  ANALYSIS

Defendant's motion raises three issues.  First, he challenges the legality of the seizure of

his person, arguing that Officer Williams lacked the reasonable suspicion required to conduct a

*Terry* stop.  *See Terry v. Ohio*, 392 U.S. 1 (1968).  Second, although not set forth as a separate

ground for suppression in his motion, Gorham's arguments raise the question of whether the

frisk that Moshier conducted after Gorham's seizure was lawful.[2]  Third, because Gorham at

times describes his motion as seeking to suppress physical evidence *and statements*, Dkt. 5 at 1;

*but see id.* at 8 (seeking only "to suppress the firearm recovered on December 4, 2017"); Dkt. 5-1

at 1 (same), the Court considers whether Gorham's statement "I've got weed on me," made after

he was seized, should be suppressed.

### A.    Seizure

The parties agree that *Terry* and *Illinois v. Wardlow*, 528 U.S. 119 (2000), provide the

relevant framework for evaluating whether the MPD officers lawfully seized Gorham.  In *Terry*,

the Supreme Court "held that an officer may, consistent with the Fourth Amendment, conduct a

brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal

activity is afoot."  *Wardlow*, 528 U.S. at 123.  An officer making such an investigatory stop,

however, "must be able to articulate more than an 'inchoate and unparticularized suspicion or

"hunch"' of criminal activity."  *Id.* at 123–24 (quoting *Terry*, 392 U.S. at 27).  The Court in

---

[2]  Gorham did raise the legality of the search as an independent ground for suppression at the
Court's second hearing on the motion.  May 18, 2018 Hrg. Tr. (Rough at 2:2–3, 9:1–9, 11:20–
21).

*Wardlow* applied the standard for reasonable suspicion articulated in *Terry* to hold that "unprovoked," "[h]eadlong flight" in combination with "presence in an area of expected criminal activity"—elsewhere referred to in the opinion as a "high[-]crime area" or "area of heavy narcotics trafficking"—suffices to justify further investigation through a brief detention. *Wardlow*, 528 U.S. at 124–26. Because Gorham's flight from the police occurred in a high-crime area, the Court concludes that the seizure of his person did not violate the Fourth Amendment. Each of Gorham's arguments to the contrary is unavailing.

First, Gorham disputes the characterization of his flight as "unprovoked" because Officer Kelemen was "within two feet of" Gorham when he fled. Dkt. 5 at 6. Gorham suggests that he was, in fact, the target of the police's approach and that Kelemen "clearly ha[d] manifested his physical presence and . . . direct[ed] it toward" the defendant. *Id.* He offers no support for the proposition that such actions somehow prevent the police from drawing the inference approved of by the Supreme Court in *Wardlow*. Although that opinion does not define what sort of flight falls under the aegis of "unprovoked," the D.C. Circuit has observed that the Supreme Court "str[uck] an explicit contrast between a person's 'right to ignore the police and go about his business' and 'unprovoked flight upon noticing the police.'" *United States v. Stubblefield*, 820 F.3d 445, 451 (D.C. Cir. 2016) (quoting *Wardlow*, 528 U.S. at 124–25). The body-worn camera footage in this case reveals nothing unusual or aggressive about the approach of the police officers that would have prevented a reasonable person from continuing to "go about his business." Gorham was free to walk away from the police—as indeed he did at first and the man in the red sweatshirt continued to do—and need not have spoken with them.[3] Conversely, the

---

[3] Gorham does not argue that he was seized prior to being tackled. Dkt. 5 at 7 ("Because Mr. Gorham did not yield to the police officer pursuing him, the seizure takes place when he is

police were free to approach him and to attempt to engage him in conversation. His decision to sprint away from the officers as soon as one drew close enough to engage in such an exchange was more than "a mere refusal to cooperate" and represents the sort of unexplained, "headlong flight" contemplated by the Supreme Court in *Wardlow*. *See* 528 U.S. at 125.

Second, Gorham asserts that the criminal activity the police have identified as occurring in the area where he was seized is of a different kind than the criminal activity at issue in *Wardlow*. He offers no legal basis, however, for drawing a distinction between "an area known for heavy narcotics trafficking"—as was the case in *Wardlow*—and an area suffering from a "recent spate of gun violence"—as was the case here. Dkt. 5 at 5. Nor does the case law support such a distinction. As noted above, the *Wardlow* Court itself described the area where that defendant was stopped in more general terms. *See* 528 U.S. at 123 (describing the Illinois state court opinions as referencing a "high[-]crime area"); *id.* at 124 ("[W]e have previously noted the fact that the stop occurred in a 'high[-]crime area' among the relevant contextual considerations in a *Terry* analysis."); *id.* (discussing "presence in an area of expected criminal activity" and "the relevant characteristics of a location"). Lower courts applying the decision, moreover, have held that a high incidence of criminal activity other than narcotics trafficking—such as gun and other violent crimes—can contribute to an officer's reasonable suspicion under the *Wardlow* test. *See, e.g.*, *United States v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013) (holding that reasonable suspicion sufficient for an investigatory stop and protective pat down existed, in part, because of "specific and recent indicia of violence, including gun-related violence"); *United States v.*

---

forcibly stopped."). Nor could he. *See United States v. Goddard*, 491 F.3d 457, 461 (D.C. Cir. 2007) (holding that no seizure occurred when four police officers, "all with guns and handcuffs showing and wearing identifiable MPD jackets and badges," quickly exited police car and approached defendant).

*Young*, 707 F.3d 598, 604 (6th Cir. 2012) (describing as "high crime" for purposes of reasonable suspicion analysis an area with a history of only violent crime). The Court, accordingly, rejects Defendant's invitation to draw a categorical distinction between "area[s] known for heavy narcotics trafficking" and areas experiencing high levels of crime involving guns.[4] The Court does, however, consider the type and intensity of past crime in the area when evaluating the reasonableness of the officers' suspicion. *See Wardlow*, 528 U.S. at 124 (holding that officers need not "ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"); *Young*, 707 F.3d at 604 (considering history of crime in an area when evaluating reasonableness of suspicion).

Third, Gorham contends that the government has failed to present sufficient evidence that the apartment complex where the relevant events occurred was a high-crime area at the time of his flight. At the evidentiary hearing held on April 16, 2018, the government presented two types of evidence in support of its characterization of the apartment complex as a high-crime area. First, it offered the testimony of Officer Kelemen regarding his own experiences in the area as a member of a special crime suppression team. Second, it provided a list of crimes recently committed in the area that Kelemen and another officer assembled using the MPD's database of police reports. Dkt. 22 at 13–14.

Taken together, the testimony of Officer Kelemen—who patrolled the area on a near daily basis—and the report adequately establish that the apartment complex at issue is a "high-

---

[4] The Court also notes that Kelemen testified that his unit patrols areas with high numbers of "citizen complaints" about "drug activity," Dkt. 22 at 5, and that the apartment complex where Gorham was first confronted had generated "a lot of citizen complaints . . . for people hanging out selling drugs," *id.* at 10; *see also id.* at 45. Even if the Court were to conclude that *Wardlow* speaks only to areas with heavy narcotics activity, in light of Kelemen's testimony, it would still reject Gorham's argument that the area in question could not have contributed to the reasonable suspicion of the officers who arrested him.

crime area" within the meaning of *Wardlow*. There is significant narcotics activity in the area, Dkt. 22 at 10–11; the officers in Kelemen's unit frequently recover guns in the area (including two prior recoveries by Kelemen himself), *id.* at 11; Kelemen has been personally involved in the arrests of more than ten people in the area, *id.* at 9; gunshots are common in the area, *id.* at 12–13; and relative to other areas within Kelemen's district, it has a higher than average number of "illegal gun arrests" and amount of gun violence, *id.* at 11–12. Government's Exhibit Five (as corrected, *see* Dkt. 13 at 2) supports Kelemen's belief that the vicinity of the apartment complex has experienced a high degree of gun-related crime. In the thirty days preceding Kelemen's interaction with Gorham, there were four reports of gunshots, two reports of bullets striking property, an armed robbery, four assaults involving guns, and two incidents involving possession of unlicensed pistols in the area. *See* Government's Ex. 5; *see also* Dkt. 22 at 17–19. Although the government has not offered any detailed comparison of crime in other neighborhoods or areas, the Court notes that on an absolute scale, the amount of crime in the weeks prior to Gorham's seizure was substantial. Indeed, the crime suppression team had been dispatched to the area on the day of Gorham's arrest at least in part because of a recent spate of gunshots. The Court further credits the testimony of Officer Kelemen that the apartment complex stood out among those within his patrol area as a frequent site of gun violence and drug distribution.

At oral argument, Gorham added a different twist to his argument, noting that the evidence of illegal gun use in the area involved activity occurring at night, while Gorham was seized in the late afternoon. He offers no support, however, for the proposition that the treatment of an area as a "high-crime" area for purposes of *Wardlow* depends on whether the flight and the past crime occurred around the same time of day. To be sure, time of day can factor into an officer's reasonable suspicion. *United States v. Laing*, 889 F.2d 281, 286 (D.C. Cir. 1989); *see*

*also United States v. Pacheco*, 841 F.3d 384, 394 (6th Cir. 2016) (observing that "time of day is relevant without being independently dispositive" to the reasonable suspicion inquiry (internal quotation marks omitted)); *United States v. Fager*, 811 F.3d 381, 386 (10th Cir. 2016) (stating that time of day "can influence an officer's reasonable suspicion"); *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000) (same). But that line of cases speaks to a distinct factor that can, at times, weigh in the totality of circumstances that determine whether there exists reasonable suspicion "that criminal activity is afoot." *Wardlow*, 528 U.S. at 123. Absent much more than Gorham has offered, however, the time of day does not preclude an officer from reasonably relying on an individual's decision to turn and flee when approached in a high-crime area, even if that criminal activity often occurs (or is often detected) later at night. To hold otherwise would run counter to the approach taken by the D.C. Circuit, *see, e.g.*, *Laing*, 889 F.2d at 286 (describing "the 'high-crime' nature of the area" and "the time of day" as separate considerations within the reasonable suspicion analysis, and not referencing any temporal element to the former); *United States v. Edmonds*, 240 F.3d 55, 60–61 (D.C. Cir. 2001) (same); *United States v. Reid*, 997 F.2d 1576, 1581 (D.C. Cir. 1993) (same), and to the commonsense notion that drugs, guns, and other contraband do not simply appear and disappear as the sun sets and rises.

The Court, accordingly, concludes that, because Gorham took headlong flight without provocation upon the approach of police officers in a high-crime area, the officers had reasonable suspicion to conduct an investigatory stop. That conclusion is buttressed by the additional indicia of suspicious activity Gorham displayed. First, as officers approached the area, Gorham immediately walked away from a larger group of people while observing the police and while all but one of the remaining members of the group took no action. Second, his body language while leaving the group—in particular his failure to swing his right arm, his

apparent effort to keep his right side facing away from the police, and his focus on his cell phone while ignoring the approaching officers—appeared indicative of firearm possession to an officer with special training in identifying armed individuals. Third, even though a second individual also walked away from the group, Gorham alone took flight as soon as Kelemen addressed him. At oral argument, Gorham's counsel stressed that this conduct is fully consistent with innocent or "everyday" behavior. May 18, 2018 Hrg. Tr. (Rough at 12:15–13:6). The Supreme Court, however, rejected a similar argument in *Wardlow*, holding that "ambiguous" conduct that is "susceptible of innocent explanation" can nonetheless support a reasonable suspicion when considered in light of "the totality of the circumstances." *Wardlow*, 528 U.S. at 125–26. Fourth, Kelemen observed that, as Gorham ran, he at times failed to "swing his right arm fully" and "a couple of times . . . held [his right arm] for a second as if he's checking something or adjusting something while he's running." Dkt. 22 at 43–44. Although the body-worn camera footage is too choppy to confirm or refute this testimony, the Court finds that Kelemen's testimony was credible.

Gorham's final objection to the *Terry* stop rests on the fact that, even if Kelemen had reasonable suspicion to seize Gorham, Kelemen is not the officer that seized him. Gorham notes that the case law requires the reasonable suspicion inquiry begin with "what facts were known to the officer" at the time of the seizure, *United States v. McKie*, 951 F.2d 399, 402 (D.C. Cir. 1991) (per curiam), and argues that, because Williams—the seizing officer—did not testify, the facts known to him remain unclear. Although the Court would have benefited from hearing from Williams, the Court does not agree that his testimony was essential. As the D.C. Circuit has explained, "[t]he *Terry* standard [is] one of objective reasonableness." *Id.* That means that the Court is "not limited to what the stopping officer says or to evidence of his subjective rationale;

rather [the Court] look[s] to the record as a whole to determine what facts were known to the officer and then consider[s] whether a reasonable officer in those circumstances would have been suspicious." *Id.*

Assuming for the sake of argument that Williams—situated mere feet away—saw *none* of the specific, suspicious movements described by Kelemen, the record makes clear that Williams still possessed sufficient information to support an investigatory stop. First, as shown by his pursuit of Gorham and his body-worn camera footage, Williams was fully aware that Gorham had taken headlong, unprovoked flight. Second, Kelemen's testimony regarding the high-crime reputation of the area leaves little doubt that this fact was widely known to the officers who patrolled the area. Kelemen testified, for instance, that the crime suppression team of which he and Williams were both members regularly responded to the area, was patrolling in the area after receiving ShotSpotter reports of gunfire, and was well aware of the criminal activity occurring in the area. Dkt. 22 at 45–47. The Court need not have before it Williams's own testimony or other "evidence of his subjective rationale," *McKie*, 951 F.2d at 402, to conclude that a reasonable officer, familiar with the area and observing Gorham's headlong flight, had an objectively reasonable basis to seize the defendant, *Wardlow*, 528 U.S. at 124.

For these reasons, Officer Williams's seizure of Gorham was based on "more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity," *Wardlow*, 528 U.S. at 123–24 (quoting *Terry*, 392 U.S. at 27), and, accordingly, did not violate the Fourth Amendment.[5]

---

[5] Although his motion references the manner in which he was seized, Gorham has not expressly challenged the force used to affect that seizure. But, even if the Court were to construe his motion to raise such an objection, the D.C. Circuit's decision in *United States v. Dykes*, 403 F.3d 717 (D.C. Cir. 2005), would decide the matter. In that case, the court held that tackling and

## B. Search

The Court's determination that the seizure of Gorham's person comported with the Fourth Amendment does not, on its own, decide the question whether Moshier's frisk of Gorham after that seizure was constitutional. A police officer may conduct "a reasonable search for weapons for the protection of the police officer, when he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* As with the seizure discussed above, the officer may not rely on an "inchoate and unparticularized suspicion or 'hunch,'" but, rather, must rest his decision to conduct a limited search for weapons on "specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.*

The present case resembles *United States v. Gross*, in which four police officers drove alongside a young man, calling out "Hey it's the police, how are you doing? Do you have a gun?" and "Can I see your waistband?" 784 F.3d 784, 785 (D.C. Cir. 2015). The police eventually stopped, got out of the vehicle, and asked if they could search the man. *Id.* at 786. He ran away instead. *Id.* An officer giving chase observed behavior similar to Gorham's

---

handcuffing a suspect who had fled after being approached by police officers was lawful. *Dykes*, 403 F.3d at 720 ("[B]ecause Dykes was in full flight from officers who were justified in stopping him, tackling him was a reasonable method of effectuating the stop."); *see also id.* (holding that handcuffing suspect was reasonable because "Dykes had kept his hands near his waistband, resisting both the officers' commands and their physical efforts to move his hands into plain view," making "it reasonable for the officers to fear that Dykes had a weapon in his waistband"). Although the suspicious behavior that supported the inference that Gorham could be armed and thus justified tackling and handcuffing him primarily occurred prior to his apprehension, it was no less significant than the behavior observed in *Dykes*.

actions, including that the suspect "patt[ed] his right side with his hand as he ran, behavior that [the officer] later testified 'can mean someone is trying to hold a gun in their waistband.'" *Id.* Once the officer caught the fleeing suspect, he frisked him and recovered a handgun from "underneath [the man's] waistband." *Id.* Although not challenged on appeal, the "district court determin[ed] that, once [the defendant] attempted to flee in response to [the officers'] question[ing], the officers had authority to stop him and conduct the frisk that uncovered the handgun on his person." *Id.* at 788. The police in *Gross* also smelled PCP during their chase, a factor absent from this case, but Gorham's flight occurred in a high-crime area and came after additional behavior Kelemen testified was suggestive of gun possession.

Similarly, the D.C. Circuit held in *United States v. Dykes* that handcuffing and frisking a suspect apprehended after flight was lawful because the officers were "justified in believing that the individual whose suspicious behavior [they] [were] investigating at close range [was] armed and presently dangerous." 406 F.3d at 720. The suspect "had kept his hands near his waistband, resisting both the officers' commands and their physical efforts to move his hands into plain view" after he was tackled to the ground. *Id.* "Under these circumstances, it was reasonable for the officers to fear that Dykes had a weapon in his waistband, and to take the necessary steps to ensure that he could not use it." *Id.* Gorham did not resist the arresting officers' commands, but prior to and during his flight, his movements—particularly turning the right side of his body away from approaching officers, walking stiffly, and touching his waistband or side while in flight—gave rise to a similarly reasonable suspicion that he was armed and presently dangerous. *See Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 83 (D.D.C. 2015) (finding reasonable suspicion that a suspect was potentially armed "based upon his hand gesture to his waistband," officers' "perception of the [suspect's] nervous behavior upon seeing the police[,]

and unprovoked flight").  The D.C. Circuit, moreover, has held that the sort of gestures observed during Gorham's flight "*independently* would justify a protective frisk," let alone when accompanied by a stop "in a medium- to high-crime area" and evasive activity by the suspect. *United States v. Bullock*, 510 F.3d 342, 348 (D.C. Cir. 2007) (collecting cases).

That leaves Gorham's argument that, even if the facts known to *Kelemen* at the time of the search would have led "a reasonably prudent man in the circumstances [to] be warranted in the belief that his safety or that of others was in danger" because he had "reason to believe that he [was] dealing with an armed and dangerous individual," *Terry*, 392 U.S. at 27, *Moshier*—the officer who conducted the frisk—lacked that knowledge.  As Moshier testified, he based his decision to frisk Gorham on Gorham's flight in a high-crime area.  Dkt. 23 at 19–20.  He did not rely on his observation of the movements (e.g., walking with his right side obscured from view and without swinging his right arm, touching his right side while running) that Kelemen testified made him suspicious that Gorham was armed.  And, although he testified that he saw a bulge on Gorham's right side, he could not recall whether he saw "the bulge before" or after he "patted [Gorham] down." *Id.* at 34–35.  Given that uncertainty, and because the government bears the burden of proof, *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016); *United States v. Jones*, 142 F. Supp. 3d 49, 56 (D.D.C. 2015), the Court must conclude that Moshier knew only that Gorham fled the police in a high-crime area.  According to Gorham, that is not enough. June 29, 2018 Hrg. Tr. (Rough at 23:15–24:7).

The government responds with two arguments.  First, it suggests that headlong, unprovoked flight in a high-crime area, without more, supports a frisk upon apprehension. *Id.* (Rough at 3:21–4:3) ("[F]light in a high-crime area . . . give[s] an officer reasonable suspicion to stop and do a protective pat down, which is exactly what happened in this case.").  At least on

the present record, the Court is unconvinced. As *Terry* held, a protective pat down or frisk is a

search, and whether a search is reasonable under the Fourth Amendment is distinct from whether

a seizure that precedes such a search is reasonable. 392 U.S. at 27. There will of course be cases

in which the justification for the seizure supplies the justification for the search—when, for

example, an individual is stopped because the officers have reasonable suspicion to believe the

individual recently committed or is about to commit a crime that often involves a weapon, *see,*

*e.g.*, *Terry*, 392 U.S. at 28; *Bullock*, 510 F.3d at 346. The government, however, presses a more

categorical rule—that "flight in a high crime area," without more, is sufficient to "support[] a

finding of reasonable suspicion to conduct a *Terry* stop *and frisk*." Dkt. 14 at 4 (emphasis

added). In support of this sweeping proposition, the government cites *Wardlow*, 528 U.S. at

121–23, Dkt. 14 at 4, but the government's reading of *Wardlow* is plainly wrong: *Wardlow* dealt

with only the legality of the defendant's *seizure* and the Court "express[ed] no opinion as to the

lawfulness of *the frisk* independently of the stop." *Wardlow*, 528 U.S. at 124 n.2 (emphasis

added).

Relying exclusively on *Wardlow*, the government fails to cite any case addressing the

question whether and when flight in a high crime area might, without more, support reasonable

suspicion to frisk a suspect who is lawfully stopped. Nor is that omission surprising, since the

government and the courts typically point to some additional indicia of risk to the safety of the

police or others. As noted above, for example, the D.C. Circuit did not rest its decision

upholding the search in *Dykes* exclusively on the defendant's flight from the police in "an area

'known for the sales of cocaine and marijuana.'" 406 F.3d at 720. To be sure, the court found

that the defendant's flight was sufficient to justify his stop. *Id.* But, when it came to the search,

the court added that "it was reasonable for the officers to fear that" the defendant "had a weapon

in his waistband" because he "kept his hands near his waistband" and resisted the officers' "efforts to move his hands into plain view." *Id.* Here, the government fails to identify any such additional information that was available to Moshier, who testified that he merely believed that Gorham was "concealing *some sort of* illegal contraband or [was the subject of *some sort of*] a warrant." Dkt. 23 at 18 (emphasis added). As a result, the Court is left to consider without any relevant precedent, and without sufficient factual development, whether Gorham's flight alone justified Moshier's decision to conduct a frisk. Given these shortcomings, and in light of the Court's ultimate holding, the Court declines to do so.

The government's second argument also raises an unsettled issue, but one that can be resolved on the record currently before the Court. In its supplemental brief, the government argues that the doctrine of "collective knowledge" permitted Moshier to rely on facts known to other officers in forming his suspicion that Gorham was presently armed and dangerous, even though Moshier himself was unaware of the facts on which those officers' suspicion was based. Dkt. 14 at 4–6. For this proposition, the government cites *United States v. Hensley*, 469 U.S. 221 (1985), in which the Supreme Court held that police officers could rely on a flyer produced by officers from another police department in forming probable cause for an arrest, even though the arresting officers were not "themselves aware of the specific facts which led their colleagues to seek their assistance," *id.* at 231. In reaching this decision, the *Hensley* Court relied on the Court's earlier decision in *Whitely v. Warden*, 401 U.S. 560 (1971), which "suggest[ed] that," where a police officer issues a "radio bulletin" based on that officer's possession of probable cause to make an arrest, other officers may make the arrest, "even though they [are] unaware of the specific facts that established probable cause." *Hensley*, 469 U.S. at 230–31.

*Whitely*, *Hensley*, and their progeny, however, do not extend as far as the government

posits.  They do not hold that the knowledge of one officer is imputed to all other officers, but

rather stand for the more modest proposition that an officer who lacks "direct personal

knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause,"

*United States v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007), may act on "a directive or request

from another officer or agency," Wayne R. LaFave, 2 Search and Seizure: A Treatise on the

Fourth Amendment, § 3.5(c) (Oct. 2017 update).  As the Supreme Court explained in *Hensley*,

the rule is a practical one that permits law enforcement officers "to act promptly in reliance on"

directives and requests made by other law enforcement officers.  469 U.S. at 231; *see also*

*United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C. Cir. 1978) (acknowledging that "the

authority of an individual officer" is not "circumscribed by the scope of his first[-]hand

knowledge of facts concerning a crime or alleged crime" (quoting *Williams v. United States*, 308

F.2d 326, 327 (D.C. Cir. 1962))).  Other courts have applied the collective knowledge doctrine in

this manner, describing it at times as "vertical" collective knowledge.  *See United States v.*

*Massenburg,* 654 F.3d 480, 493 (4th Cir. 2011); *United States v. Rodriguez-Rodriguez*, 550 F.3d

1223, 1228 n.5 (10th Cir. 2008); *see also Ramirez*, 473 F.3d at 1033; *United States v. Burton*,

288 F.3d 91, 99 (3d Cir. 2002); *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759–60 (5th Cir.

1999); *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987).

The question presented in this case, however, is not whether Moshier could have relied

on information, conclusions, or a directive relayed to him by Kelemen or any other officer, a

situation that would be analogous to the facts of *Whitely* and *Hensley*.  It is instead whether the

Court can impute to Moshier the knowledge or concern that Kelemen had regarding the risk that

Gorham was armed, even in the absence of any evidence that Kelemen or any other officer

conveyed Kelemen's concern to Moshier or directed or requested that he act based on that concern. The government finds support for this broader interpretation of the collective knowledge doctrine in *United States v. Burnett*, 827 F.3d 1108 (D.C. Cir. 2016). The Court is unpersuaded.

In *Burnett*, the D.C. Circuit did state that because "[p]robable cause may be based on the 'collective knowledge of the police,'" it would "refer to the federal agents and the Maryland Police collectively as the 'officers.'" *Id.* at 1114–15 (quoting *Hawkins*, 595 F.2d at 752 n.2). But, read in context, this assertion merely reflects the well-settled rule, set forth in *Hensley*, 469 U.S. at 230–31, and in the D.C. Circuit's decision in *Hawkins*, 595 F.2d at 752 n.2, that an officer may act on a request to stop and search a suspect made by another officer—or another law enforcement agency—who had probable cause to justify the stop and search. As the reasoning of the *Burnett* court makes clear, federal agents developed probable cause to stop and search the defendant's car; they asked the Maryland State Police to execute the stop and search; and the Maryland State Police complied with that request in reliance on the probable cause that the federal agents possessed. *See* 827 F.3d at 1115 (describing observations made over a period of months as part of a long-running investigation involving multiple officers); *see also United States v. Burnett*, No. 12-cr-42, Defendant's Motion to Suppress Physical Evidence and Controvert Search Warrant, ECF No. 54 at 45 (Affidavit in Support of Search Warrant) ("At the direction of DEA agents, a Maryland State Trooper conducted a traffic stop on [the] vehicle . . . ."). That is precisely what *Hensley* and *Hawkins* permit, and the *Burnett* decision goes no further than those cases. Nor has the D.C. Circuit had occasion to decide in any other case whether the government's more sweeping view of the collective knowledge doctrine withstands scrutiny.

Those courts of appeals that have confronted the issue are divided. The First, Third, and Seventh Circuits have held that information may be aggregated "horizontally" among officers working closely together even absent evidence of a communication or directive. *See United States v. Whitfield*, 634 F.3d 741, 746 (3d Cir. 2010) ("It would make little sense to decline to apply the collective knowledge doctrine in a fast-paced, dynamic situation such as we have before us, in which the officers worked together as a unified and tight-knit team; indeed, it would be impractical to expect an officer in such a situation to communicate to the other officers every fact that could be pertinent in a subsequent reasonable suspicion analysis."); *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) ("[C]ommon sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop. . . . Officers who jointly make such stops rarely will have an opportunity to confer during the course of the stop."); *United States v. Edwards*, 885 F.2d 377, 382 (7th Cir. 1989). *But see United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (describing collective knowledge doctrine as only encompassing situations involving vertical collective knowledge).

The Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits have also permitted the aggregation of knowledge "regardless of whether any information giving rise to probable cause was actually communicated to the officer conducting the stop, search, or arrest," albeit only when the officers are working as a team, as evidenced by *some* "communication among agents." *Ramirez*, 473 F.3d at 1031–33 (internal quotation marks, citations, emphasis, and alterations omitted); *see also United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005) (holding that "if there has been some degree of communication between the officers" who are "work[ing] together on an investigation," the court applies "the so-called 'collective knowledge' theory to impute the

knowledge of one officer to others" (internal quotation marks omitted)); *United States v. Kye Soo Lee*, 962 F.2d 430, 435 (5th Cir. 1992) ("It is not necessary that the arresting officer himself have personal knowledge of all of the facts. . . . [P]robable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest, when there is some degree of communication between the two." (internal quotation marks and citations omitted)); *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989) ("Since the knowledge of the . . . investigators working together on the scene and in communication with each other is mutually imputed, we do not require that every arresting officer possess all of the information that, when amassed, gives rise to probable cause."); *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) ("A reviewing court may examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation."); *United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) ("[W]e do mutually impute the knowledge of all the agents working together on the scene and in communication with each other.").  Although this theory of aggregation does not require that the officers share information relevant to the probable cause (or reasonable suspicion) determination, it requires some communication among the officers as a means of determining whether the officers are "functioning as a team" or functioning as "independent actors who merely happen to be investigating the same subject." *Terry*, 400 F.3d at 581.

The Second, Fourth, and Tenth Circuits, in contrast, have categorically rejected the "horizontal" collective knowledge doctrine.  *See United States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016) ("Absent record evidence that [the first officer] communicated his suspicion or any relevant information to [the second officer] before the latter began to conduct the protective search, we will not impute his knowledge or reasonable suspicion to [the second officer] under

the doctrine of collective knowledge."); *Massenburg*, 654 F.3d at 493 (discussed below); *United States v. Chavez*, 534 F.3d 1338, 1347 (10th Cir. 2008) (rejecting "a rule that information known, individually, to officers is pooled (as if they were one sentient law-enforcing organism) even absent any evidence of communication" of that information); *United States v. Shareef*, 100 F.3d 1491, 1504 (10th Cir. 1996) (acknowledging "the value in imputing knowledge among officers working closely together" and noting that "[e]ven in the absence of evidence of communication among officers . . . when officers act collectively it may sometimes be appropriate to look to their collective knowledge in determining whether they behaved reasonably," but declining to do so).

On this question of first impression in this circuit, the Court finds the reasoning of the Fourth Circuit in *United States v. Massenburg* persuasive. The Fourth Circuit observed in that case that "[t]he rationale behind the Supreme Court's collective-knowledge doctrine is, as the Court noted in *Hensley*, 'a matter of common sense: [the rule] minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions [or officers] and enables police . . . to act promptly in reliance on information from another jurisdiction [or officer].'" *Massenburg*, 654 F.3d at 494 (quoting *Hensley*, 469 U.S. at 231). Under this "vertical" understanding of the collective knowledge doctrine, "law enforcement efficiency and responsiveness [is] increased," *id.*, and individual officers are allowed to rely on the implicit representation from their colleagues that sufficient grounds exist for the search or seizure. In this sense, the executing officers are acting as the agents or proxies of, or are relying on information provided by, the officers who possess probable cause or reasonable suspicion.

The "horizontal" collective knowledge doctrine, in contrast, goes considerably further. Absent some requirement of communication of the relevant facts or conclusions, or an

instruction premised on those facts or conclusions, "[t]he officer deciding whether or not to perform a given search will simply know that she lacks cause," and, "in ordinary circumstances, she will have no way of estimating the likelihood that her fellow officers hold enough uncommunicated information to justify the search." *Id.* That goes beyond the type of "useful shortcut[]" that allows the executing officer to rely on the implicit representation that probable cause (or reasonable suspicion) exists, as occurs in the "vertical" collective knowledge decisions. *Id.* As the Fourth Circuit correctly concluded, "[t]he [g]overnment's proposed aggregation rule would perversely reward officers acting in *bad faith* according to the result of an after-the-fact aggregation inquiry that is simply academic." *Id.* The Court, accordingly, will not extend the collective knowledge doctrine to encompass cases in which no actual communication or direction occurs between the officer conducting the search or seizure and the officer in possession of the information giving rise to the required reasonable suspicion and where the relevant facts are merely aggregated after the fact.

In light of a separate strand of persuasive authority, however, the Court nevertheless concludes that the gun seized during Moshier's frisk of Gorham should not be suppressed. In *United States v. Ragsdale*, 470 F.2d 24 (5th Cir. 1972), the Fifth Circuit confronted a situation similar to the present case. There, two police officers were engaged in a car stop. *Id.* at 26. One officer observed a pistol on the front floorboard of the car. *Id.* "As [that officer] walked with [the defendant] past [the second officer] on the way to the patrol car, he whispered" to the second officer that he had seen a gun and was going to search the defendant's person. *Id.* The second officer searched the car and found the gun, but he later testified that he had never heard the first officer's whisper. *Id.* at 26–28. The issue before the court—just as in this case—was whether the search was reasonable, despite the searching officer having lacked actual knowledge of the

facts that would have justified a search, and if not, whether the exclusionary rule should be applied to exclude the fruits of the search. *Id.* at 28–31.

The Fifth Circuit concluded that the search was indeed reasonable, because the first officer "was duty-bound to make a search or cause one to be made to recover the evidence of what he reasonably believed to be a more serious crime." *Id.* at 29. The court recognized that, "[i]f the knowledge of th[e] team of officers [was treated as] fragmented," one might reasonably contend that the officer who had observed the gun "should be the only one allowed to search since he may have been the only one who knew this last, utterly conclusive fact"—that is, that a potentially unlawful gun was present. *Id.* at 30. But the court then held that "logic require[d] that [it] focus on the broader concept—reasonableness." *Id.* "Unless [the first officer] was to be derelict in his duty," a search "had to be" conducted before the defendant could be released, and the car "had to be searched during the moments that" the defendant was temporarily and properly detained. *Id.* If the second officer had not searched the car himself, the officer in possession of the knowledge that an unlawful gun might be present "would surely have commanded it, or . . . performed it himself." *Id.* The Fifth Circuit concluded that "the fact that one member of the team moved too swiftly," was not sufficient ground to invalidate the search that his partner would "surely" have conducted or directed. *Id.* For a court "to insist on bifurcating the knowledge of the officers and isolating [one] from the realities of the existing situation" would lead to a "hypertechnical" result. *Id.*

In the view of a leading treatise, the "result [in *Ragsdale*] is not open to serious question." LaFave, Search and Seizure, § 3.5(c), and at least one other circuit has embraced the Fifth Circuit's reasoning, *United States v. Meade*, 110 F.3d 190, 198 n.12 (1st Cir. 1997) (holding that "regardless of the presently unknown knowledge of the other agents (none testified at the

suppression hearing), it is apparent that [the officer possessing sufficient knowledge] would have imminently and lawfully discovered and arrested [the defendant]" even if another officer had not previously "begun the arrest process"). To be sure, the facts of *Ragsdale* are "unusual" and it is unclear "[j]ust how far the *Ragsdale* rule may be pushed." LaFave, Search and Seizure, § 3.5(c). But the central premise of the decision is both persuasive and applicable to the facts of this case. At the time of the search, an officer present at the scene who was duty bound to act believed that the defendant possessed a gun and, therefore, posed a risk to that officer and others. The only reason that officer failed to conduct the search, moreover, was simply that another "member of the team moved too swiftly." *Ragsdale*, 470 F.2d at 30. If he had not done so, the officer who believed the defendant possessed a gun "would surely have commanded it, or would have . . . performed [the search] himself." *Id.*

Unlike in the typical "horizontal" collective knowledge case, *Ragsdale* does not require a post-hoc aggregation of information among officers; rather, an officer with all the required information was present and "it is clear the search would imminently and lawfully have been made." LaFave, Search and Seizure, § 3.5(c) (internal quotation marks omitted). As a result, the principal concerns raised in *Massenburg* are not present and the purposes of the exclusionary rule would not be served by excluding the evidence. In the words of Fifth Circuit:

> Unless we were to presume the unlikely possibility that an officer would be encouraged to conduct an unlawful search on the faint hope that his partner possessed probable cause, no proper purpose of that rule would be served by denying to justice the truth which the search disclosed.

*Ragsdale*, 470 F.2d at 31.

The facts of this case are, if anything, even more compelling than those in *Ragsdale*. Kelemen was in possession of all the knowledge necessary to justify a protective frisk of Gorham and had, by chasing and helping to handcuff Gorham, "indicat[ed] his mind had

operated upon those facts so as to conclude that he could or should" conduct a further investigation of Gorham. LaFave, Search and Seizure, § 3.5(c). He was working closely with three other officers, who had observed him pursue Gorham. Immediately upon the seizure of Gorham, the officers begin discussing what to do next, working together to handcuff him. These facts demonstrate a team working closely together as part of an investigation, and an officer (Kelemen) who was duty-bound to conduct a frisk—or to see to it that others conducted a frisk—the moment the defendant was secured. Unlike most "horizontal" collective knowledge cases, no aggregation is required in the present case—one of the officers present and personally involved in the seizure of Gorham possessed all of the information necessary to support the frisk. Although he did not communicate his concern to Moshier, it is inconceivable that Kelemen would have sat by while the handcuffs were removed from a suspect who he believed to be armed without first ensuring that that his suspicion was allayed. "The fact that one member of the team moved too swiftly," *Ragsdale*, 470 F.2d at 30, and began the search before a directive could be given or Kelemen himself could frisk Gorham is of no moment.

The Court's conclusion that Kelemen "would surely have" directed his colleagues to conduct a frisk, or "would have . . . performed it himself," *id.*, moreover, is bolstered by footage from the officers' body-worn cameras. That footage shows Kelemen personally involved in restraining Gorham, and it shows that as soon as Gorham was turned over, a large object can be seen on the right side of his thigh, where, according to Kelemen's testimony, he already believed Gorham had hidden his gun. Dkt. 22 at 43–44. In short, the Court is convinced that, if given another moment, Kelemen would have either communicated his concern or would have frisked Gorham himself.

Finally, the Court notes that, as in *Ragsdale*, there is no evidence that Moshier or any of the other officers acted in bad faith. The Court has heard testimony from both Moshier and Kelemen and has reviewed the footage from the body-worn cameras used by Moshier, Kelemen, and Williams. This evidence, which depicts in detail the events surrounding the search, supports the conclusion that Moshier acted on a good faith belief that he possessed a reasonable suspicion that Gorham was armed and dangerous. The Court declines to reach the question whether that belief was in fact reasonable, and a good faith mistaken belief could not, of course, justify a search. But it is evident that Moshier was not attempting to justify an unlawful search based on the uncommunicated observations of his fellow officers. The presence of bad faith would compel a different result from the one the Court reaches here.

Although it is unclear whether the *Ragsdale* rule is best understood as a variation on the collective doctrine or as an exception to the exclusionary rule akin to the inevitable discovery rule, the soundness of the rule in the unique circumstances presented in *Ragsdale*, and here, "is not open to serious question." LaFave, Search and Seizure, § 3.5(c). The Court, accordingly, concludes that the gun recovered from Gorham's person will not be suppressed.

## C. Statements

For statements made by a defendant in response to police questioning while in custody to be admissible at trial, the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), generally requires a series of warnings have first been read to the accused, *id.* at 478. "[S]pontaneous statements," however, "are admissible without *Miranda* warnings." *United States v. Samuels*, 938 F.2d 210, 214 (D.C. Cir. 1991) (citing *United States v. Gonzalez*, 875 F.2d 875, 881 (D.C. Cir. 1989)). Here, the parties do not dispute that—although clearly in custody at the time—Gorham "volunteered the statement" regarding marijuana "without prompting from the police." *Id.* That means that *Miranda* does not require its suppression.

27

**CONCLUSION**

Based on the totality of the circumstances, the Court concludes that the seizure of Gorham's person was justified by a reasonable suspicion that he might be engaging in criminal activity. The Court further concludes, moreover, that the gun discovered during Moshier's pat down of Gorham need not be suppressed. Finally, the Court concludes that Gorham's statement regarding marijuana after he was seized was spontaneous, and thus need not have been preceded by *Miranda* warnings to be admissible. The Court, accordingly, **DENIES** Defendant's motion to suppress physical evidence and statements. Dkt. 5.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: August 5, 2018